# In the United States Court of Federal Claims

No. 19-55C

(E-filed:  September 20, 2019)[1]

| | |
|---|---|
| ANHAM FZCO, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Post-Award Bid Protest; Scope of |
| | )   Corrective Action; Waiver of Claims; |
| THE UNITED STATES, | )   Abuse of Discretion; Best Value |
| | )   Determination; Responsibility |
| Defendant, | )   Determination; 48 C.F.R. § 9.103 |
| | )   (2018); 48 C.F.R. § 9.104-1 (2018); |
| and | )   Permanent Injunctive Relief. |
| | ) |
| KGL FOOD SERVICES WLL, | ) |
| | ) |
| Intervenor-Defendant. | ) |
| | ) |

Kelly E. Buroker, Washington, DC, for plaintiff.

Daniel S. Herzfeld, Trial Attorney, with whom appeared Joseph H. Hunt, Assistant Attorney General, Robert E. Kirschman, Jr., Director, and Douglas K. Mickle, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant.  Daniel K. Poling, R. Zen Schaper, Gale Furman, and Cathleen Choromanski, Defense Logistics Agency, of counsel.

John E. McCarthy, Jr., Washington, DC, for intervenor-defendant.

---

[1]     This opinion was issued under seal on August 29, 2019.  Pursuant to ¶ 10 of the ordering language, the parties were invited to identify source selection, proprietary or confidential material subject to deletion on the basis that the material was protected/privileged.  The parties' agreed-upon redactions are acceptable to the court.  All redactions are indicated by brackets ([ ]).

<u>OPINION</u>

CAMPBELL-SMITH, Judge.

Plaintiff filed this bid protest to challenge the award of a contract for the provision of "food distribution services in support of U.S. troops and other personnel in" Iraq, Jordan, and Kuwait.  ECF No. 147 at 1 (second amended complaint).  Seven motions are now before the court:  (1) plaintiff's motion for entry of a temporary restraining order, ECF No. 148; (2) plaintiff's motion for entry of a preliminary injunction, ECF No. 149; (3) plaintiff's motion for judgment on the administrative record (AR), ECF No. 153; (4) defendant's cross-motion for judgment on the AR, ECF No. 155; (5) intervenor-defendant's cross-motion for judgment on the AR, ECF No. 156; (6) defendant's motion to strike, ECF No. 163; and (7) defendant's motion to complete the AR, ECF No. 164.  The motions are fully briefed and ripe for a decision by the court.

In ruling on these motions, the court has considered the following:  (1) plaintiff's second amended complaint, ECF No. 147 (complaint); (2) the AR, ECF Nos. 36-58, 69, 71, 120, 179, and 181; (3) plaintiff's motion for entry of a temporary restraining order, ECF No. 148; (4) plaintiff's motion for entry of a preliminary injunction, ECF No. 149; (5) plaintiff's motion for judgment on the AR, ECF No. 153; (6) defendant's response to plaintiff's motions for entry of a temporary restraining order, preliminary injunction, and judgment on the AR, and its cross-motion for judgment on the AR, ECF No. 155; (7) intervenor-defendant's response to plaintiff's motions for entry of a temporary restraining order, preliminary injunction, and judgment on the AR, and its cross-motion for judgment on the AR, ECF No. 156; (8) plaintiff's reply in support of its motions for entry of a temporary restraining order, preliminary injunction, and judgment on the AR, and its response to defendant's and intervenor-defendant's cross-motions for judgment on the AR, ECF No. 160; (9) intervenor-defendant's reply in support of its cross-motion for judgment on the AR, ECF No. 161; (10) defendant's reply in support of its cross-motion for judgment on the AR, ECF No. 162; (11) defendant's motion to strike, ECF No. 163; (12) defendant's motion for leave to complete the AR, ECF No. 164;[2] (13) plaintiff's response to defendant's motion for leave to complete the AR, ECF No. 166; (14) plaintiff's response to defendant's motion to strike, ECF No. 167; (15) defendant's reply in support of its motion for leave to complete the AR, ECF No. 169; (16) defendant's reply in support of its motion to strike, ECF No. 170; (17) plaintiff's sur-reply to defendant's motion to complete the AR, ECF No. 173; (18) defendant's supplement to the AR, ECF No. 179, and (19) defendant's supplement to the AR, ECF No. 181.

---

[2]     Defendant filed this motion as a motion for leave to supplement the administrative record (AR), <u>see</u> ECF No. 164, but upon review of the motion, the court deemed the motion as one for leave to complete the AR, <u>see</u> ECF No. 165 (order).

The parties combined briefing for the motion for entry of a temporary restraining order, the motion for entry of a preliminary injunction, and the motion and cross-motions for judgment on the AR.  <u>See</u> ECF No. 151 (scheduling order).  Because briefing on both the requests for interim injunctive relief and the merits were completed at the same time, the court will proceed directly to consideration of the merits.

Accordingly, and for the reasons set forth below:  (1) plaintiff's motion for entry of a temporary restraining order, ECF No. 148, is **DENIED** as moot; (2) plaintiff's motion for entry of a preliminary injunction, ECF No. 149, is **DENIED** as moot; (3) plaintiff's motion for judgment on the AR, ECF No. 153, is **GRANTED in part**, and **DENIED in part**; (4) defendant's cross-motion for judgment on the AR, ECF No. 155, is **GRANTED in part**, and **DENIED in part**; (5) intervenor-defendant's cross-motion for judgment on the AR, ECF No. 156, is **GRANTED in part**, and **DENIED in part**; (6) defendant's motion to strike, ECF No. 163, is **DENIED** as moot; and (7) defendant's motion to complete the AR, ECF No. 164, is **DENIED** as moot.

I.    Background

    A.    The Solicitation

On December 15, 2018, the Defense Logistics Agency (DLA) issued a request for proposals, number SPE300-15-R-0042 (the solicitation).  <u>See</u> ECF No. 36-1 at 92.  The solicitation requested offers "for subsistence Prime Vendor support to military and other federally funded customers located throughout the countries of Kuwait, Iraq, Syria, and Jordan."  <u>Id.</u> at 877.  DLA sought to "enter into a Fixed Price Indefinite Delivery Indefinite Quantity ('IDIQ') Contract, . . . with a full line food distributor who will act as a Prime Vendor responsible for the supply and delivery of semi-perishable and perishable food items as well as non-food Food Service Operating Supply ('FSOS') items."  <u>Id.</u>  The solicitation instructed offerors to submit proposals in multiple volumes.  The submission requirements for Volume I addressed the solicitation forms that each offeror was required to complete, and directed offerors to list any affiliates "that will be utilized for this contract," along with those forms.  <u>See</u> ECF No. 36-1 at 993-94.  The submission requirements for Volume II addressed the technical evaluation materials, including the information related to the experience and past performance factors at issue here.  <u>See id.</u> at 994.  DLA used the technical proposals in Volume II of each proposal to evaluate five factors:  (1) Warehouse Location and Capacity; (2) Experience; (3) Quality Control, Assurance, and Warehouse Management System Procedures; (4) Resource Availability (Case Flow, Equipment, and Carrier Agreements); and (5) Implementation and Management Plan.  <u>Id.</u> at 994-99; 1012-14.

The solicitation stated that DLA "will award a contract resulting from this solicitation to the responsible offeror whose offer conforming to the solicitation will be most advantageous to the Government, price and other non-price factors considered."  <u>Id.</u>

at 1012.  The "non-price" factors include evaluation of the technical proposal and past
performance.  See id.  The solicitation states that each part of the technical proposal and
past performance "are of equal importance to each other and will be evaluated on a
comparative basis among offerors," and notes that both the technical proposal and past
performance "are significantly more important than price."  Id.  "However, as proposals
become more equal in their technical merit, the evaluated price becomes more
important."  Id.  And the solicitation also cautions offerors that "[a]ny offeror that
receives an Unacceptable rating on any individual factor will be considered Technically
Unacceptable and will not be eligible for award."  Id.

       B.     Proposals and Initial Award

      DLA received seven offers in response to the solicitation, including proposals
from plaintiff and intervenor-defendant (KGL or KGLFS).  ECF No. 54-1 at 1458.  The
offerors submitted final revisions on June 7, 2017.  See ECF No. 45-3 at 726 through
ECF No. 47-1 at 112.  The source selection advisory counsel (SSAC) subsequently
assigned ratings to the proposals, as reflected in a chart reproduced here:

| Technical Factors I-V Rating Key: O=Outstanding, G=Good, A=Acceptable, M=Marginal, & U=Unacceptable<br><br>Past Performance Rating Key: SUC=Substantial Confidence; SAC=Satisfactory Confidence; LC=Limited Confidence, and UC=Unknown Confidence (Neutral) | | | | | | | |
|---|---|---|---|---|---|---|---|
| Non-Price Component | ANHAM | [ ] | [ ] | [ ] | [ ] | KGL | [ ] |
| Factor I—Warehouse Location and Capacity | G | G | G | G | G | O | G |
| Factor II—Experience | O | M | M | M | M | A | A |
| Factor III—Quality Control Assurance and Warehouse Management System/Procedures | O | O | O*<br><br>*Changed to G | G | G | O | G |
| Factor IV—Resource Availability (Cash Flow, Equipment, | G | G | G | G | G | G | G |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| and Carrier Agreements[)] | | | | | | | |
| Factor V—Implementation and Management Plans | O | O | G | G | G | G | O |
| Past Performance | SAC | LC | SAC | SAC | LC | SAC | SAC |
| Overall Technical Rating | G | G | G | G | A | G | G |

ECF No. 48-2 at 400.  The SSAC then compared overall technical ratings with price in a second chart, as reproduced here:

| Offeror | Overall Technical Rating | Total Evaluated Price | % Above Low | $ Above Low |
|---|---|---|---|---|
| KGL | G | $132,288,115.74 | Lowest | |
| [ ] | G | [ ] | [ ] | [ ] |
| ANHAM | G | $150,815,549.80 | 14% | $18,527,434.06 |
| [ ] | G | [ ] | [ ] | [ ] |
| [ ] | G | [ ] | [ ] | [ ] |
| [ ] | G | [ ] | [ ] | [ ] |
| [ ] | A | [ ] | [ ] | [ ] |

Id.  On the basis of this evaluation, the SSAC "concluded that the proposal from KGL represents the best value to the Government."  Id. at 394.  DLA awarded KGL the contract on January 12, 2018.  See ECF No. 48-3 at 172.

5

C.      GAO Protests

Plaintiff filed a protest action with the Government Accountability Office (GAO), challenging DLA's award to KGL.  See ECF No. 49-1 at 24-66.  On May 8, 2018, the GAO sustained the protest in part, and denied the protest in part.  See ECF No. 54-1 at 1454-70.  With regard to the sustained portions of the protest, the GAO found that:  (1) DLA improperly considered a particular contract as part of its evaluation of KGL's experience; and (2) DLA improperly considered more than two team member contracts from KGL, which was prohibited by the terms of the solicitation.  See id. at 1463-65.

The GAO also commented, in a footnote, as follows:

ANHAM also challenges the reasonableness of the agency's determination that the awardee provided warehouse facilities that were owned by the awardee. ANHAM points out that KGLFS's proposal did not present its warehouses as owned by KGLFS, and, in fact, specifically provided that the warehouses were to be leased from a separate KGLFS affiliated company. While the agency explains that its evaluation recognized that the warehouses were owned by a KGLFS affiliated company--and not KGLFS--the agency nevertheless found that, since both firms were owned by a common parent company, it was appropriate to give KGLFS ownership credit for the warehouses. However, the record is unclear as to whether the agency reasonably found that the ownership of the warehouses by an affiliated company can be attributed to the offeror, which has a separate legal identity. Thus, in implementing our recommendations, the agency may wish to consider reviewing the reasonableness of its determination that KGLFS should be give[n] ownership credit for its warehouses.

ECF No. 54-1 at 1469 n.16.

Plaintiff raised a number of other challenges to DLA's initial award to KGL, all of which were denied by the GAO.  Those grounds included:  (1) plaintiff's assertion that DLA failed to consider adverse information relating to KGL's responsibility, id. at 1467; and (2) plaintiff's allegation that KGL materially misrepresented its ability to make use of its proposed warehouses, id. at 1468.  In conclusion, the GAO recommended that DLA "either reevaluate KGLFS's final proposal under the experience factor in accordance with the terms of the solicitation and document a new source selection decision, or revise the solicitation to reflect the agency's requirements and obtain revised proposals."  Id. at 1470.

D.      Corrective Action and New Award

In response to the GAO's decision, DLA developed a plan to take the following corrective action:

A letter will be sent to each offeror to clarify if its selected contracts for Factor II – Experience, and Past Performance were performed by the offering entity or its team member.  If more than two team member contracts are identified, the offeror will be asked to specify which two team member contracts shall be retained for the re-evaluation. . . . .  Technical and price proposal revisions shall be prohibited.

Upon receipt of the clarifications to the technical proposals, the Source Selection Evaluation Board (Chairperson) will conduct a limited re-evaluation of the technical proposals.  Specifically, Factor II – Experience, and Past Performance, will be re-evaluated in accordance with the terms of the solicitation. Also, Factor I will be reviewed only in regard to the reasonableness of DLA Troop Support's determination that KGL was given ownership credit for its warehouses.

The revised technical evaluations will be used to make a new award decision.

ECF No. 57-3 at 10 (memorandum dated May 25, 2018).  To execute this plan, DLA sent clarification letters to, and received responses from, each offeror.  See ECF No. 57-3 at 11-89 (including clarification letters dated May 29, 2018, and KGL's response dated June 12, 2018).

The reevaluation resulted in revisions to DLA's technical evaluations, as reflected in the Source Selection Decision Document (SSDD), and reproduced here:

**Technical Factors I-V Rating Key:  O=Outstanding, G=Good, A=Acceptable, M=Marginal, & U=Unacceptable**

**Past Performance Rating Key:  SUC=Substantial Confidence; SAC=Satisfactory Confidence; LC=Limited Confidence, and UC=Unknown Confidence (Neutral)**

| Non-Price Component | ANHAM | [ ] | [ ] | [ ] | [ ] | KGL | [ ] |
|---|---|---|---|---|---|---|---|
| Factor I—Warehouse Location and Capacity | G | G | G | G | G | O | G |
| Factor II—Experience | O | A | A | A | M | M | A |

| Factor III—Quality Control Assurance and Warehouse Management System/Procedures | O | O | G | G | G | O | G |
|---|---|---|---|---|---|---|---|
| Factor IV—Resource Availability (Cash Flow, Equipment, and Carrier Agreements[)] | G | G | G | G | G | G | G |
| Factor V—Implementation and Management Plans | O | O | G | G | G | G | O |
| Past Performance | SAC | LC | SAC | SAC | SAC | SAC | SAC |
| Overall Technical Rating | G | G | G | G | G | G | G |

ECF No. 58-1 at 255.  The chart reflecting the technical rating and price comparison was revised as follows:

| Offeror | Overall Technical Rating | Total Evaluated Price | % Above Low | $ Above Low |
|---|---|---|---|---|
| KGL | G | $132,288,115.74 | Lowest | |
| [ ] | G | [ ] | [ ] | [ ] |
| ANHAM | G | $150,815,549.80 | 14% | $18,527,434.06 |
| [ ] | G | [ ] | [ ] | [ ] |
| [ ] | G | [ ] | [ ] | [ ] |
| [ ] | G | [ ] | [ ] | [ ] |
| [ ] | G | [ ] | [ ] | [ ] |

Id. at 261.

In the SSDD, DLA also engaged in a lengthy "Technical-Price Tradeoff Analysis," in which it compared the KGL proposal (the lowest price offer) to each of the others. Id. at 260-72. On December 18, 2018, DLA again selected KGL as the awardee because "KGL's technical proposal is among the most highly rated overall (although other offerors are more highly rated on some factors) and KGL has the lowest total evaluated price." Id. at 273. The SSDD further explains:

> As documented by the contracting officer in the determination of responsibility for KGL, see attached, KGL is a responsible offeror that can successfully perform on the proposed contract for the area based on its level of experience as evidenced by its offer and references. . . .

> KGL has the necessary . . . distribution network to fulfill the needs of the contract. It also has the proper experience, supply chain management procedures and system, quality control and warehouse procedures, and resources (cash flow, equipment, and carrier agreements) in place to successfully perform under the subject contract.

> KGL's price proposal substantiates its ability to support all items in this solicitation and the complete catalog, to include adding new items for the customer according to the DoD Services' menu requirements.

> In conclusion, KGL has presented a proposal that has a technical strategy rated as Good, combined with a Business Proposal that the Government has determined to contain fair and reasonable pricing for all prices that will be included in the contract. . . .   In addition, KGL's total evaluated price of $132,288,115.74 is the lowest offered price.

> ANHAM's technical proposal was, on a comparative basis, the only proposal that was considered to be technically better than KGL's.  Although technical merit is significantly more important than price, as discussed above, the added benefits of the ANHAM proposal, in light of the strengths contained in the KGL proposal, do not justify paying an evaluated 14% premium. Therefore, I have determined that KGL's overall proposal represents the best value to the Government.

Id.  DLA awarded the contract to KGL for a second time on December 21, 2018.  See ECF No. 58-4 at 14.

E.       Plaintiff's Court of Federal Claims Protest

Plaintiff filed the instant protest action on January 10, 2019.  See ECF No. 1.  On February 15, 2019, the parties filed a joint status report in which they proposed an agreed-upon briefing schedule to address the merits of this case.  See ECF No. 74 at 2. Therefore, the parties also informed the court of defendant's plans for proceeding with transition activities.  Specifically, they stated:  "As this protest proceeds, the Defense Logistics Agency (DLA) expects to begin a limited transition with the awardee, KGL Food Services WLL (KGL)."  Id. at 1.  The report further represented to the court that "DLA and KGL are in the process of finalizing the terms of that limited transition, but the parties anticipate that the transition will not involve KGL performing activities such as (1) ordering product, (2) receiving transfer of incumbent stock, (3) receiving customer orders, or (4) delivering customer orders."  Id.  Defendant agreed to provide notice to the court five days before undertaking any of the excepted activities.  See id.  Defendant provided that notice to the court on April 8, 2019, see ECF No. 104, and plaintiff did not object to defendant's plans or otherwise directly respond to defendant's filing.

On April 23, 2019, plaintiff filed a motion for voluntary dismissal of a portion of its original case in order to allow for filing in federal district court.  See ECF No. 122.[3] Plaintiff also requested that the court stay this case pending resolution of the district court case.  See ECF No. 124.  The court granted plaintiff's motion for voluntary dismissal, see ECF No. 126, and stayed the case pending a decision in district court, see ECF No. 135. The court lifted the stay on May 31, 2019, following the conclusion of the district court proceedings, and the parties proceeded to address the remaining merits of plaintiff's case. See ECF No. 145 (order).  On June 3, 2019, plaintiff filed its second amended complaint in this matter.  See ECF No. 147.

II.     Legal Standards

The Tucker Act grants this court jurisdiction

to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract

---

[3]       Plaintiff was, at the beginning of this protest, suspended by DLA from competition.  See ECF No. 71-1 at 2-6 (suspension decision dated December 27, 2018). That suspension decision was challenged in plaintiff's original complaint, see ECF No. 1, but plaintiff later voluntarily dismissed the suspension challenge in favor of filing that claim in federal district court, see ECF No. 126 (order granting dismissal).  During the pendency of the district court proceedings, DLA lifted the suspension, and the district court dismissed the case before it.  See ECF No. 145 (order memorializing the status conference in which plaintiff updated the court on the status of the district court proceedings).

or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement . . . without regard to whether suit is instituted before or after the contract is awarded.

28 U.S.C. § 1491(b)(1) (2012).

The court's analysis of a "bid protest proceeds in two steps." Bannum, Inc. v. United States, 404 F.3d 1346, 1351 (Fed. Cir. 2005). First, the court determines, pursuant to the Administrative Procedure Act standard of review, whether the "agency's action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with [the] law." Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d 901, 907-08 (Fed. Cir. 2013) (citing 28 U.S.C. § 1491(b)(4) (adopting the standard of 5 U.S.C. § 706)). If the court finds that the agency acted in error, the court then must determine whether the error was prejudicial. See Bannum, 404 F.3d at 1351.

To establish prejudice, "a protester must show 'that there was a substantial chance it would have received the contract award but for that error.'" Alfa Laval Separation, Inc. v. United States, 175 F.3d 1365, 1367 (Fed. Cir. 1999) (quoting Statistica, Inc. v. Christopher, 102 F.3d 1577, 1582 (Fed. Cir. 1996)). "In other words, the protestor's chance of securing the award must not have been insubstantial." Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir. 2003). The substantial chance requirement does not mean that plaintiff must prove it was next in line for the award but for the government's errors. See Sci. & Mgmt. Res., Inc. v. United States, 117 Fed. Cl. 54, 62 (2014); see also Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996) ("To establish prejudice, a protester is not required to show that but for the alleged error, the protester would have been awarded the contract."). Demonstrating prejudice does require, however, that the plaintiff show more than a bare possibility of receiving the award. See Bannum, 404 F.3d at 1358 (affirming the trial court's determination that the plaintiff had not demonstrated a substantial chance of award when its "argument rest[ed] on mere numerical possibility, not evidence").

Given the considerable discretion allowed contracting officers, the standard of review is "highly deferential." Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000). As the Supreme Court of the United States has explained, the scope of review under the "arbitrary and capricious" standard is narrow. See Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974). "A reviewing court must 'consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment," and "[t]he court is not empowered to substitute its judgment for that of the agency.'" Id. (quoting Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416 (1971)); see also Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1368-69 (Fed. Cir. 2009) (stating that under highly deferential rational basis review, the court will "sustain an agency action 'evincing

rational reasoning and consideration of relevant factors'") (citing Advanced Data Concepts, 216 F.3d at 1058).

III.    Motions for Judgment on the Administrative Record

In its motion for judgment on the AR, plaintiff argues that it is entitled to declaratory and injunctive relief because "DLA's award to KGLFS was arbitrary, capricious, an abuse of discretion and contrary to law and regulation." ECF No. 153 at 22. Plaintiff summarizes its argument as follows: "DLA's improper consideration of a non-team member reference in connection with its experience and past performance evaluations, its irrational finding that KGLFS effectively owned its proposed warehouse, and its failure to consider critical, known, information in connection with its responsibility determination renders its award decision invalid." Id. at 22-23. The court will address each part of plaintiff's argument, in turn.

A.    KGL's Experience (Factor II) and Past Performance

Plaintiff argues that DLA improperly considered two contracts, which were performed by KGL affiliates, in evaluating KGL's proposal. See id. at 23-31. The solicitation expressly allows offerors to rely on the experience and past performance of affiliates, but the proposal "must clearly demonstrate that the team member will have meaningful involvement in performance of the resultant contract." See ECF No. 36-1 at 996, 999. DLA relied on two contracts in evaluating KGL's experience (Factor II of the technical evaluation) and past performance: (1) a contract between KGL affiliate KGL General Trading and Contracting (KGL Trading) and the United Nations Interim Force in Lebanon (UNIFIL); and (2) the KGL affiliate KGL Transportation Co. KSCC's (KGL Transport) OIR-I Iraq Line Haul (OIR-Iraq) contract. See ECF No. 57-4 at 194-97, 282-85. Based on these two contracts, DLA rated KGL as "Marginal" as to the Experience factor, and "Satisfactory Confidence" as to the Past Performance factor. Id. at 194, 284.

According to plaintiff, KGL's proposal failed to demonstrate that KGL General Trading would have meaningful involvement in the contract at issue, and that the KGL Transport contract was of "dubious relevance." ECF No. 153 at 24. Plaintiff contends that had DLA properly evaluated KGL's proposal, it would have been rated "unacceptable," id. at 23, a rating that would have—under the terms of the solicitation— prevented KGL from receiving the award, see ECF No. 36-1 at 1012 ("Any offeror that receives an Unacceptable rating on any individual factor will be considered Technically Unacceptable and will not be eligible for award.").

1.      The KGL General Trading Contract

        a.      KGL's Failure to List KGL General Trading as an Affiliate in Volume I

Plaintiff claims that DLA should not have considered the UNIFIL contract because KGL General Trading was not listed as either a team member or a subcontractor in KGL's proposal. See ECF No. 153 at 25.  In support of its argument, plaintiff quotes Ernst & Young, LLP v. United States, 136 Fed. Cl. 475, 514-15 (2018), for the proposition that "the text of the solicitation ultimately 'governs how the proposals are to be evaluated.'" ECF No. 153 at 25. Here, the solicitation instructed offerors to "submit a complete list of your affiliates, subsidiaries, and partially or wholly-owned companies that will be utilized in this contract.  If not applicable, a negative reply is required."  ECF No. 36-1 at 994.  In response to this requirement, KGL identified four affiliates in its proposal, but not KGL General Trading.  See ECF No. 40-1 at 449.

Defendant responds to this argument by differentiating between the requirements for "Volume I" and "Volume II" of the proposal.   As previously noted, the submission requirement for Volume I addresses the solicitation forms that each offeror was required to complete.  Offerors were directed to include the list of affiliates along with those forms as part of Volume I.  See ECF No. 36-1 at 993-94.  Volume II addresses the required technical evaluation materials, including the information related to the experience and past performance factors at issue here.  See id. at 994.  According to defendant, "KGL's failure to list KGL General Trading as a subsidiary or affiliate in Volume 1 was not dispositive as to whether KGL intended to use KGL General Trading for meaningful involvement in performing contract requirements."  ECF No. 162 at 8.

In the court's view, the plain language of the solicitation indicates that KGL should have listed KGL General Trading as part of its "complete list  of . . . affiliates . . . that will be utilized in this contract," in Volume I of its proposal.  ECF No. 36-1 at 994. It is not clear, however, that DLA was required to reject the contract in the evaluation of KGL's technical proposal as a result of this error.  The solicitation language quoted above does not specify a consequence for failing to list an affiliate.  See id.  And the parties have not identified any part of either the experience factor or the past performance factor sections of Volume II that explicitly limits the involvement of affiliates to those listed in Volume I.  See id. at 996, 999.   Thus, plaintiff has not shown that DLA's failure to reject the UNIFIL contract is contrary either to law or to the text of the solicitation.

Furthermore, DLA's decision to consider the UNIFIL contract was not arbitrary, capricious, or an abuse of discretion.  As defendant points out:

> ANHAM's technical proposal (as echoed in its original complaint) stated ANHAM's intent  to use its affiliate—ANHAM USA, Inc.—to  provide

> management and support services for this contract.  However, ANHAM did not list ANHAM USA in its Volume 1 submission, it listed only ANHAM Al Kuwait WLL for Food Products.

ECF No. 162 at 9 (internal citations omitted).  See also ECF No. 36-3 at 195 (Volume I of plaintiff's proposal listing ANHAM AL Kuwait WLL for Food Products as its only affiliate or subsidiary "that will be utilized for this contract"); ECF No. 179-1 at 16 (Volume II of plaintiff's proposal listing ANHAM USA as an administrative management support office); ECF No. 47-1 at 118-30 (DLA's evaluation summary of ANHAM's Factor I proposal).  DLA considered both technical proposals despite the fact that neither offeror identified their respective affiliates in Volume I of their proposals.  This is convincing evidence of consistent—rather than arbitrary or capricious— treatment of the offerors.

> b.    KGL General Trading's Meaningful Involvement in the Contract

Plaintiff next argues that KGL failed to demonstrate that KGL General Trading would be meaningfully involved in the contract performance, as required by the solicitation.  See ECF No. 153 at 25.  As noted above, the solicitation permits DLA to consider the experience and past performance of KGL affiliates so long as the proposal "clearly demonstrate[s] that the team member will have meaningful involvement in performance of the resultant contract."  See ECF No. 36-1 at 996, 999.  An "'agency properly may attribute the experience or past performance of a parent or affiliated company to an offeror where the firm's proposal demonstrates that the resources of the parent or affiliated company will affect the performance of the offeror.'"  Precision Asset Mgmt. Corp. v. United States, 135 Fed. Cl. 342, 357 (2017) (quoting Femme Comp Inc. v. United States, 83 Fed. Cl. 704, 747 (2008)).  Examples of meaningful involvement include "reliance on the 'workforce, management, facilities or other resources' of the parent or affiliated company."  Id. (quoting IAP World Servs. Inc, B-407917.2, 2013 CPD ¶ 171, 2013 WL 2817472, at *8 (Comp. Gen. July 10, 2013)).

In the course of its re-evaluation of KGL's proposal, DLA concluded that:

> KGL General Trading and Contracting WLL will have meaningful involvement in the resultant contracts.  Their ISO22000:2005 certified Food Safety Management System and ISO 9001:2008 Quality Management System will be used and key personnel that performed under the UNIFIL contract will take part in the resultant contract including Mr. [ ], Mr. [ ], and Mr. [ ].

ECF No. 57-4 at 194.[4]  Plaintiff contests this assessment in the strongest terms.  Plaintiff claims that KGL's proposal fails to demonstrate that "KGL General Trading will perform any function under the contract, much less an essential function.  Nor does the proposal demonstrate that KGL General Trading will have any 'meaningful  involvement' in the performance of the contract, as required by the [solicitation]."  ECF No. 153 at 25.  In particular, plaintiff highlights the fact that KGL's proposal included no memoranda of understanding or written agreements with KGL General Trading.  Id.  Plaintiff also accuses DLA of an "attempt to paper over" its error in considering the KGL General Trading contract.  Id. at 26.

In response, defendant points to several aspects of KGL's proposal to support DLA's conclusion that KGL General Trading would "have meaningful involvement in the resultant contracts."  ECF No. 57-4 at 194.  First, defendant notes the general statement made by KGL in its proposal that:  "Each affiliate company within the entire KGL enterprise has committed itself to providing all available resources to ensure the success of this contract, through both implementation as well as sustainment throughout the entire duration of the contract."  ECF No. 40-1 at 473.  DLA also identified two specific instances of how KGL General Trading would participate in the contract:  (1) its ISO 22000:2005 certified Food Safety Management System; and (2) the use of key personnel who worked on the KGL General Trading contract.  See ECF No. 57-4 at 194.

Defendant explains that KGL General Trading's food safety management certification demonstrates its ability to provide "whole sale procurement, transportation, receiving, storage, and dispatch of food products and production of bread."  ECF No. 155 at 24 (citing ECF No. 40-1 at 528; ECF No. 40-2 at 33-35).  KGL included a list of its "ISO certified systems" as part of its proposal related to quality control, including the ISO 22000:2005 certificates.  See ECF No. 40-1 at 528.  Copies of KGL General Trading's ISO 22000:2005 certificates were also attached to KGL's proposal.  See ECF No. 40-2 at 33-35 (copies of the certificates which were valid until December 1, 2017, after the date on which final proposal revisions were due).[5]  According to defendant, DLA correctly interpreted the inclusion of these certificates as an example of KGL

---

[4]      Defendant concedes that ISO 9001:2008 Quality Management System certification should not have been included here, as it is held not by KGL General Trading, but a different KGL entity.  See ECF No. 155 at 24-25 n.1.

[5]      KGL states, in its reply in support of its motion for judgment on the AR, that KGL General Trading was the only KGL entity that holds an ISO 22000:2005 certificate.  See ECF No. 161 at 8.  Although the court has no reason to doubt the veracity of this statement, it also cannot verify the same.  The court does note, however, that the only ISO 22000:2005 certificates attached to the proposal were held by KGL General Trading. See ECF No. 40-2 at 33-35.

General Trading's intended involvement in contract performance.  See ECF No. 155 at 24.

With regard to DLA's reliance on key personnel "that performed under the UNIFIL contract, . . . including Mr. [ ], Mr. [ ], and Mr. [ ]," plaintiff asserts that "DLA invented this theory during its reevaluation in order to justify its otherwise irrational conclusions." ECF No. 153 at 27.  According to plaintiff, KGL did not present key individuals as part of their proposal, and has "admitted that none of the personnel referred to by DLA—Messrs. [ ] . . . —were employed by KGL General Trading." Id. at 27-28.

Contrary to plaintiff's assertion, the resumes of all three named individuals were submitted to DLA as part of KGL's proposal.  See ECF No. 40-1 at 643 (resume of [ ], submitted with initial proposal); ECF No. 42-5 at 50 (resume of [ ], submitted during the first round of negotiations); id. at 55 (resume of [ ], submitted during the first round of negotiations).  Mr. [ ] was, in fact, the first person named in the "Key Personnel Experience" section of the proposal.  See ECF No. 40-1 at 636.  The description of his experience highlights the fact that as the [ ] for KGL Holding, "he is directly involved in all major government and military contracts to include the UNIFIL project which is responsible for the delivery of food products to UN Peacekeepers in Lebanon." Id.  Mr. [ ]'s resume states that he was the "[ ]" on the UNIFIL contract for sixteen years.  ECF No. 42-5 at 50.  And Mr. [ ]'s resume states that as the [ ] for KGL, he "[m]anaged and monitored compliance with all US NATO and UN Contract Deliverables." Id. at 55.

Plaintiff also objects to DLA's reliance on the experience of these individuals in evaluating KGL's experience and past performance because they were not employed by KGL General Trading, the entity who was a party to the UNIFIL contract.  See ECF No. 153 at 27-28.  According to plaintiff, any experience these individuals had "is not enough" because the solicitation "required that the offeror demonstrate the meaningful involvement of the affiliate in order to rely on that experience or past performance." Id. at 28 (emphasis in original).  Plaintiff reads the solicitation to prohibit consideration of individual experience under the "Experience" factor (Factor II) because such experience is explicitly part of the "Implementation and Management Plans" factor (Factor V).  See ECF No. 36-1 at 1013-14.

Plaintiff is correct that the evaluation criteria for Factor II does not expressly contemplate individual experience, but refers instead to the "offeror's record of Experience." See id. at 1013.  Plaintiff is likewise correct that the evaluation criteria for Factor V does contemplate consideration of individual experience, stating the "offeror's identification of key personnel, by position, and their relevant individual experience, will be examined in order to determine the anticipated success of the firm in providing service to its customers." Id. at 1014.  The separation of corporate and individual experience between Factors II and V, in plaintiff's view, implicitly prohibits consideration of individual experience to support an offeror's rating for Factor II.  See ECF No. 153 at 28.

16

To support its position, plaintiff cites to a decision in which the GAO stated that "an agency may not substitute the experience of a firm's key personnel for corporate experience where the terms of the solicitation reasonably preclude such substitution, such as where the solicitation includes separate evaluation criteria for corporate and key personnel experience." Dix Corp., B-293964, 2004 CPD ¶ 143, 2004 WL 1578995, at *3 (Comp. Gen. July 13, 2004).

In response, defendant argues that DLA's consideration of personnel experience under Factor II was permissible because it was not specifically prohibited. See ECF No. 155 at 26 ("ANHAM points to no provision of the Solicitation prohibiting the use of key personnel to demonstrate meaningful involvement, but simply asserts that the Solicitation implicitly prevented it because there was a Corporate Experience factor and an Implementation and Management Plans factor, which considered key personnel."). Defendant cites to a different, potentially contrary, GAO decision stating that "where the 'experience of organization' evaluation standard did not contain a statement limiting evaluation of offeror experience, it was reasonable to consider personnel experience" even if such experience would be considered in a separate section of the evaluation. Envtl. Health Research & Testing, Inc., B-237208, 90-1 CPD ¶ 169, 1990 WL 277677, at *6 (Comp. Gen. Feb. 9, 1990).

For its part, KGL rejects the premise of plaintiff's argument and claims that it "is not substituting the experience of key personnel for corporate experience." ECF No. 156 at 14. Rather, consideration of the individual experience "demonstrated that KGLFS will not only benefit from the corporate experience of its affiliate in performing the UNIFIL Contract, but will also leverage additional UNIFIL assets (i.e. personnel)" for the contract at issue here. Id. at 15.

Having considered the parties' extensive arguments, and the deferential standard of review under which the court operates, the court concludes that DLA did not commit a clear error of judgment in finding that KGL demonstrated meaningful involvement on the part of KGL General Trading. In the context of this case, the court need not resolve any tension that may exist between the cited GAO decisions relating to whether DLA properly considered personnel experience in evaluating KGL's proposal under Factor II. Personnel experience aside, DLA could reasonably have determined that KGL General Trading would make a meaningful contribution to, and would positively affect, KGL's contract performance through use of its ISO 22000:2005 certificates.

The purpose of this contract is to provide for "supply and delivery of semi-perishable and perishable food items as well as non-food Food Service Operating Supply ('FSOS') items" to "military and other federally funded customers located throughout the countries of Kuwait, Iraq, Syria, and Jordan." ECF No. 36-1 at 877. The ISO 22000:2005 certificates qualified KGL General Trading to provide food safety management for the procurement, transportation, receiving, storage, and dispatch of

wholesale food, as well as the production of bread.  See ECF No. 40-1 at 528.  The expertise offered by KGL General Trading correlates closely with the stated purpose of the contract, and reasonably could be viewed as a means of facilitating an important aspect of contract performance.

Plaintiff argues that KGL's proposal "does not state, or even imply, that KGL General Trading will handle food safety management functions in connection with" the contract.  ECF No. 153 at 27.  The absence of such a statement, according to plaintiff, "strongly suggests no active role was contemplated by this entity.  Certainly, DLA had no rational basis to believe otherwise."  Id.  Although a narrative description of KGL General Trading's involvement would have been useful to the present analysis, ultimately the court disagrees.  The references to, and the copies of, the ISO certificates held by KGL General Trading in the proposal are an adequate basis for DLA's belief that KGL General Trading would have meaningful involvement in the contract.

The court also notes that plaintiff's own argument that "ISO certificates cannot simply transfer to a different entity," lends credence to this conclusion.  Id. at 27 n.16.  The parties have not presented evidence on the transferability of ISO certificates, but taking plaintiff's view of matters, if KGL General Trading was the only entity permitted to operate under the ISO certificates, and the ISO certificates are expressly relied upon in KGL's proposal, then KGL's proposal necessarily contemplates the involvement of KGL General Trading in contract performance.  This reasonable inference, taken together with KGL's statement that "[e]ach affiliate company within the entire KGL enterprise has committed itself to providing all available resources to ensure the success of this contract," see ECF No. 40-1 at 473, leads the court to conclude that DLA's assessment that KGL General Trading would be meaningfully involved in contract performance was not clearly erroneous.

2.      The KGL Transport Contract

In its motion for judgment on the AR, plaintiff argues that the KGL Transport (OIR-Iraq) contract cannot, on its own, support the ratings DLA assigned to KGL's experience and past performance.  Plaintiff explains:

The record establishes that DLA premised KGLFS's experience and past performance ratings on the collective consideration of both the UNIFIL and OIR-Iraq contract references.  And, ANHAM has demonstrated that DLA improperly credited KGLFS with the UNIFIL reference.  Proper removal of the UNIFIL reference requires, at a minimum, that DLA go back and reevaluate KGLFS's experience and past performance based solely on the lone remaining OIR-Iraq contract reference.  Such a reevaluation could not result in DLA assigning KGLFS the same ratings.

ECF No. 153 at 29 (emphasis in original) (internal citations omitted).  To the extent that this argument relies on a finding that DLA committed clear error in considering the KGL General Trading contract, the argument is moot given the court's conclusion to the contrary.

Plaintiff presents one alternative argument by way of a footnote in its opening brief that reads as follows:

> Assuming arguendo the UNIFIL contract could be considered, KGLFS's two references collectively did not support a rating higher than unacceptable under the revised [source selection plan].  From the outset, the RFP mandated that DLA limit the credit afforded to these two contracts as neither was performed by the offeror.  See [ECF No. 36-1 at 996]. . . . Even when considered together, the two contracts only demonstrated an annual value of ~37% of the current work.

Id. at 30 n.19.  Although plaintiff does not specifically identify the limitation to which it adverts, it is apparently referring to the section in the solicitation stating:

> Offerors that are relying on the experience information of their team members must clearly demonstrate that the team member will have meaningful involvement in the performance of the resultant contract for that experience to be considered.  The most relevant experience, and that which will receive the most credit, however, is the information directly related to the offering entity.

ECF No. 36-1 at 996.  What plaintiff identifies as a limitation, the court reads as an announced priority.  Through this language, DLA puts offerors on notice that experience garnered by the offering entity would carry more weight than experience from affiliates. This section of the solicitation does not require that affiliate contracts make up a certain percentage of the contract value or otherwise require direct offeror experience.  Plaintiff's alternative argument reads restrictions into the solicitation that are not reasonably inferred from the plain text.

B.      Ownership of KGL's Warehouse

The first factor of the technical proposals addressed the warehouse facilities proposed by each offeror.  See ECF No. 36-1 at 994-96, 1013.  The stated evaluation criteria for Factor I specified that "[t]he location of warehouses and facilities, as well as the nature of and risk attendant with the offeror's access to and control over said warehouses and facilities will be evaluated." Id. at 1013.  The evaluation criteria further made clear that DLA would prefer existing warehouses, owned by the offeror, over other arrangements.  See id.  The solicitation contemplated that each proposal would receive

19

one of five ratings for Factor I:  outstanding, good, acceptable, marginal, or unacceptable. ECF No. 58-1 at 214-15.  The considerations for the outstanding rating were explained, as follows:

> **OUTSTANDING:** The offeror completed FAR 52.215-6 Place of Performance demonstrating that it has a CONUS [(Continental United States)] and OCONUS [(Outside the Continental United States)] distribution network to fulfill the needs of the contract. The proposed concept of operations between the parties is clear, concise, and ensures successful and efficient contract performance. The offeror currently has operational OCONUS warehousing, layout, and open capacity greater than required to fulfill the needs of the contract.  <u>The majority of the OCONUS operations will be performed from offeror-owned facility(ies)</u> and the available yard space used for shipping and receiving simultaneously is more than adequate to ensure a smooth flow of out bound trucks without obstructing the ability to receive in-coming product.

<u>Id.</u> at 214 (emphasis added).

KGL received an "Outstanding" rating for Factor I of its technical proposal.  <u>See</u> ECF No. 58-1 at 255.  Plaintiff now argues that DLA's evaluation of Factor I of KGL's proposal was improper for two reasons:  (1) DLA should not have given KGL credit for owning the proposed warehouse, ECF No. 153 at 32-35; and (2) DLA failed to consider the risk that KGL Logistics would be evicted from the proposed warehouse, <u>see id.</u> at 35-37.

        1.    KGL's Ownership Credit

KGL proposed the use of a warehouse owned by an affiliate, KGL Logistics.  <u>See</u> ECF No. 40-1 at 467-68.  KGL's proposal included a memorandum of understanding which reflected an intention for KGL and KGL Logistics to enter into an agreement for the warehouse space, if KGL received the award.  ECF No. 42-5 at 87-89.  Despite the fact that KGL did not own the warehouse at issue, DLA assigned KGL's proposal an "Outstanding" rating reasoning that "[a]lthough KGL Logistics is the owner of the facility, KGL Food Service is given offeror owner credit because both firms are affiliate companies operating under the same Parent Company enterprise."  ECF No. 47-2 at 155; ECF No. 57-4 at 150.  DLA further justified its decision to treat KGL as the owner of the proposed warehouse because it found that affiliates had "the same interest in providing access to the warehouse facilities," and determined that the affiliate "relationship provides for a level of control that lessens the risk of losing access to and control over the proposed warehouse facilities."  ECF No. 57-4 at 150.

Plaintiff objects to DLA's promotion of KGL to ownership status with regard to the proposed warehouse as contrary to the terms of the solicitation. See ECF No. 153 at 32. According to defendant, however, DLA's decision was justified because "[n]othing in the evaluation criteria prohibited considering the facility of an offeror's affiliate as owned by the offeror, given the relationship and agreement between KGL and KGL Logistics." ECF No. 155 at 31.

The court agrees with plaintiff. It is certainly true that contracting authorities are afforded considerable discretion in the contracting process. See Advanced Data Concepts, 216 F.3d at 1058. That discretion, however, does not extend so far as to permit an agency to expand the definition of an unambiguous term. See Banknote Corp. of America, Inc. v. United States, 365 F.3d 1345, 1353 (2004) (stating that "[i]f the provisions of the solicitation are clear and unambiguous, they must be given their plain and ordinary meaning"). The rating criteria quoted above clearly indicate that an "Outstanding" rating would be assigned only to proposals contemplating that a "majority of the OCONUS operations will be performed from offeror-owned facility(ies)." ECF No. 36-1 at 214 (emphasis added). Because KGL was not the owner of its proposed warehouse, its proposal could not meet this standard. KGL was simply ineligible, under the plain terms of the solicitation, to receive an "Outstanding" rating for Factor I of its technical proposal, and DLA abused it discretion in assigning KGL ownership status.

2.      Risk of KGL's Eviction from Its Proposed Warehouse

Plaintiff also challenges DLA's failure to adequately account for risks attendant to KGL's proposed warehouse. According to KGL, the warehouse it proposes to use for contract performance was built by KGL Logistics on land owned by the State of Kuwait, and administered by the Kuwait Ports Authority (KPA). See ECF No. 58-3 at 119. In its motion for judgment on the AR, plaintiff argues that DLA "failed to reasonably consider the risk associated with KGLFS's proposed use of KGLL's warehouses in light of the KPA eviction order and blacklisting decree." ECF No. 153 at 35. Plaintiff explains the alleged circumstances, as follows:

> KPA owns the land upon which the KGLL warehouse rests, and as DLA knows, KPA evicted KGLL from Mina Abdullah and blacklisted all KGL entities, prohibiting KGL entities from doing business with KPA. Not only did the Kuwait First Instance Court affirm the eviction order on September 20, 2017, the court also affirmed the blacklisting decree on November 18, 2018, ~1 month before DLA re-awarded the contract to KGLFS. Meaning, no KGL entity has any legal authority to use the Mina Abdullah warehouses proposed here.

Id. at 35-36 (internal citations omitted). In response, defendant argues that its actions were reasonable because the documents referred to by plaintiff "post-dated the

submission of final proposal revisions and, because DLA conducted a limited reevalution based on already-submitted proposals, DLA did not consider this new information as part of its reevalution of KGL's technical proposal."  ECF No. 155 at 32.  For its part, KGL argues that plaintiff has waived this argument because it did not timely object to the scope of the corrective action.  See ECF No. 156 at 25.

The court agrees with KGL.  The record shows that the parties were well-aware of the legal issues surrounding KGL's access to its warehouse during the GAO protest, months before DLA decided to take corrective action.  In a letter to the GAO dated March 12, 2018, plaintiff noted that allegations made in the course of its protest put DLA on notice of KGL's legal issues.  See ECF No. 54-1 at 993 (plaintiff quoting DLA statement admitting that "DLA Troop Support was generally unaware of either this [eviction] civil litigation or the KPA 'blacklisting' prior to the protests received in response to this award decision.").  And in the same letter, plaintiff discussed the alleged problems with KGL's access to its warehouse at length.  See ECF No. 54-1 at 993-1003.  The GAO acknowledged the issue in its final decision, and addressed the matter, as follows:

> The agency and awardee, however, explain that KGLFS is ready and able to perform.  In this regard, the agency states that it asked KGLFS at is onboarding meeting following award if it was able to perform, and the agency further received a letter during the pendency of this protest from the awardee, stating it was willing and able to perform as laid out in the proposal.  Moreover, the agency independently verified that the KGLFS affiliated entity is still performing warehousing duties at its facility in Kuwait.[]  Thus, given that the record does not show that KGLFS's offer to provide its warehouses or otherwise perform the contract in accordance with the terms of the contract was false, we find no basis to sustain this protest ground.

ECF No. 54-1 at 1468 (GAO's May 8, 2018 decision).  The GAO ultimately sustained the protest on only two grounds, concluding that:  (1) DLA improperly considered a particular contract as part of its evaluation of KGL's experience; and (2) DLA improperly considered more than two team member contracts from KGL, which was prohibited by the terms of the solicitation.  See id. at 1463-65.

DLA took limited corrective action, and requested clarifications from the offerors that were narrowly tailored to the problems identified in the GAO's decision.  See ECF No. 57-3 at 9-10 (memorandum for record, dated May 25, 2018, explaining corrective action).  DLA explained in its plan for corrective action that it would seek the following information from the offerors:

> A letter will be sent to each offeror to clarify if its selected contracts for Factor II – Experience, and Past Performance were performed by the offering

> entity or its team member.  If more than two team member contracts are
> identified, the offeror will be asked to specify which two team member
> contracts shall be retained for the re-evaluation. . . .  Technical and price
> proposal revisions shall be prohibited.

Id. at 10.  DLA's memorandum regarding its planned corrective action did acknowledge
that GAO suggested reconsideration of the warehouse ownership issue, and stated that
"Factor I will be reviewed only in regard to the reasonableness of DLA Troop Support's
determination that KGL was given ownership credit for its warehouses."  Id.  DLA,
however, requested no additional information from the offerors regarding their proposed
warehouses, and did not mention the risk of eviction issue.  See id.

On May 29, 2018, DLA sent nearly identical clarification letters to the offerors,
including both plaintiff and KGL stating, in relevant part, that:

> In accordance with the subject GAO decision, a limited re-evaluation of
> KGL's SPE300-15-R-0042 final proposal revision dated June 7, 2017 will
> be conducted.  Specifically, Factor II – Experience, and Past Performance,
> will be re-evaluated in accordance with the terms of the solicitation.

> You are only required to clarify, as specified below, the information
> contained in your final technical proposal.  Technical proposal revisions are
> prohibited.  Price proposal revisions are also prohibited.

> **TECHNICAL PROPOSAL – VOLUME II**

> 1.  Factor II – Experience.  The highest dollar value and most comparable
> contracts that were included in your final proposal dated June 7, 2017 are
> summarized below.  In accordance with the submission requirement of the
> solicitation for Experience, no more than 2 team member contracts may be
> included in your selected contracts.  Please clarify the following:

> . . .

> 2.  Past Performance.   The highest dollar value and most comparable
> contracts that were included in your final proposal dated June 7, 2017 are
> summarized below.  In accordance with the submission requirement of the
> solicitation for Past Performance, no more than 2 team member contracts
> may be included in your selected contracts.  Please clarify the following:

> . . .

> Upon receipt of clarifications to your final proposal revision dated June 7, 2017, the Government intends to make a new award decision without obtaining further clarifications.

ECF No. 57-3 at 21-22 (clarification letter to KGL, omitting charts listing contracts to be clarified); see also id. at 11-12 (clarification letter to plaintiff).  Plaintiff's response to the clarification letter, submitted on June 8, 2018, includes no narrative from plaintiff.  See id. at 25.  Instead, plaintiff appears to have simply completed the charts included in DLA's clarification letter like a worksheet, and sent the same letter back to DLA.  See id.

In an addendum to the corrective action memorandum, dated July 23, 2018, DLA made several revisions to the solicitation relating to the experience and past performance evaluation criteria, but requested no new information from offerors.  See id. at 116-19.  The addendum repeated DLA's intention to review Factor I "only in regard to the reasonableness of DLA Troop Support's determination that KGL was given ownership credit for its warehouses."  Id. at 118.  On December 18, 2018, DLA again selected KGL as the awardee because "KGL's technical proposal is among the most highly rated overall (although other offerors are more highly rated on some factors) and KGL has the lowest total evaluated price."  ECF No. 58-1 at 273.

Plaintiff did not contest the scope of the proposed corrective action prior to DLA's second award decision, does not explain its failure to do so, and offers no justification for its strategy for doing so now.  Plaintiff simply argues that "[c]ertainly, the scope of DLA's corrective action was not limited such that it could ignore performance risks."  ECF No. 153 at 36.  Plaintiff's approach, however, is barred by binding precedent.  In Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308, 1315 (Fed. Cir. 2007), the United States Court of Appeals for the Federal Circuit held that "a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection afterwards in a § 1491(b) action in the Court of Federal Claims."  See also id. at 1314 ("'Vendors cannot sit on their rights to challenge what they believe is an unfair solicitation, roll the dice and see if they receive award [sic] and then, if unsuccessful, claim the solicitation was infirm.'") (quoting Argencord Mach. & Equip., Inc. v. United States, 68 Fed. Cl. 167, 175 n.14 (2005)).

Although Blue & Gold did not involve corrective action, this court applies its seminal rule when a bidder fails to object to an error in the scope of a corrective action prior to a new award.  In XPO Logistics Worldwide Government Services LLC v. United States, 134 Fed. Cl. 783 (2017), aff'd, 713 F. App'x 1008 (Fed. Cir. 2018), for example, the plaintiff waited until after corrective action was completed to challenge the agency's allegedly misleading and unequal discussions in the initial evaluation process.  The court held that the plaintiff had waived its right to object to the discussion process after an award was made pursuant to corrective action because the plaintiff:  (1) was aware of the

alleged flaws in the discussion process well before corrective action was announced, and (2) was also aware that "the agency did not intend to hold discussions as part of any corrective action." Id. at 799 (citing Blue & Gold, 492 F.3d at 1313-15). See also CBE Grp., Inc. v. United States, 138 Fed. Cl. 230, 236-37 (2018) (holding that plaintiff waived its right to raise an argument in a post-award protest when it was aware of the issue prior to corrective action) (citing Blue & Gold, 492 F.3d at 1313-15)).

The same application of Blue & Gold pertains here. The record demonstrates that plaintiff was aware of KGL's legal issues in Kuwait well before the GAO ruled on plaintiff's protest. See, e.g., ECF No. 54-1 at 993 (plaintiff's March 12, 2018 letter to the GAO noting that it put DLA on notice of KGL's legal issues in the course of the GAO protest). When the GAO issued its decision, it specifically addressed plaintiff's concerns regarding KGL's risk of eviction, but found "no basis to sustain this protest ground." Id. at 1468. And following the GAO's decision, plaintiff received a clarification letter announcing the scope of the intended corrective action, stating:

> In accordance with the subject GAO decision, a limited re-evaluation of ANHAM's SPE300-15-R-0042 final proposal revision dated June 7, 2017 will be conducted. Specifically, Factor II – Experience, and Past Performance, will be re-evaluated in accordance with the terms of the solicitation.
>
> You are only required to clarify, as specified below, the information contained in your final technical proposal. Technical proposal revisions are prohibited. Price proposal revisions are also prohibited.

ECF No. 57-3 at 11. Because the GAO did not suggest that DLA re-evaluate the risk of eviction issue in this letter, plaintiff was on notice that it should have raised the issue in response. [6] As such, plaintiff has waived its right to protest DLA's failure to consider the risk of KGL's eviction from its warehouse during the corrective action. [7]

---

[6]     The content of DLA's memoranda regarding its corrective action plan lends further support to the court's finding that plaintiff waived the risk of eviction argument. As noted above, both memoranda state that Factor I will only be reviewed with regard to whether KGL should receive ownership credit for its proposed warehouse. See ECF No. 57-3 at 10, 118. It is not clear from the record, or the parties' arguments, however, whether these memoranda were communicated to the offerors. For this reason, the court's finding of waiver does not rely on the statements contained therein.

[7]     In reaching this conclusion, the court does not express any opinion—or make any ruling—as to whether DLA should have considered the import of KGL's legal issues in Kuwait with regard to Factor I of its technical proposal.

3.    Prejudice

Because the court has found that DLA abused its discretion with regard to KGL's ownership credit, it proceeds to the prejudice analysis on this issue.  To establish prejudice, "a protester must show 'that there was a substantial chance it would have received the contract award but for that error.'"  Alfa Laval, 175 F.3d at 1367 (quoting Statistica, 102 F.3d at 1582).  Here, plaintiff argues that absent DLA's error with regard to KGL's Factor I rating, plaintiff "would have been found technically superior, and almost certainly received the award."  ECF No. 153 at 37.

In comparing plaintiff's and KGL's proposal following corrective action, DLA created the following chart:

| Technical Factors I-V Rating Key:  O=Outstanding, G=Good, A=Acceptable, M=Marginal, & U=Unacceptable<br><br>Past Performance Rating Key:  SUC=Substantial Confidence; SAC=Satisfactory Confidence; LC=Limited Confidence, and UC=Unknown Confidence (Neutral) | | |
| --- | --- | --- |
| Non-Price Component | KGL | ANHAM |
| Factor I—Warehouse Location and Capacity | O | G |
| Factor II—Experience | M | O |
| Factor III—Quality Control Assurance and Warehouse Management System/Procedures | O | O |
| Factor IV—Resource Availability (Cash Flow, Equipment, and Carrier Agreements[]) | G | G |
| Factor V—Implementation and Management Plans | G | O |
| Past Performance | SAC | SAC |
| Overall Technical Rating | G | G |
| Total Evaluated Price | $132,288,155.74 | $150,815,549.80 |

ECF No. 58-1 at 196.

If KGL's Factor I rating was changed from "Outstanding" to "Good," its technical proposal would have received the same ratings as plaintiff's for Factors I, III, and IV, but would have received lower ratings than plaintiff's for Factors II and V.  There is a substantial chance that such an outcome would make plaintiff's proposal technically superior.  And while the court does not adopt plaintiff's near certainty that it would have received the award, by demonstrating that its proposal was technically superior to KGL's, plaintiff has established that but for DLA's error, "there was a substantial chance it would have received the contract award."  Statistica, 102 F.3d at 1582.

C.    Best Value Determination

In its final analysis, before awarding the contract to KGL for a second time, DLA stated:

> KGL has presented a proposal that has a technical strategy rated as Good, combined with a Business Proposal that the Government has determined to contain fair and reasonable pricing for all prices that will be included in the contract. . . .  In addition, KGL's total evaluated price of $132,288,115.74 is the lowest offered price.
>
> ANHAM's technical proposal was, on a comparative basis, the only proposal that was considered to be technically better than KGL's.  Although technical merit is significantly more important than price, as discussed above, the added benefits of the ANHAM proposal, in light of the strengths contained in the KGL proposal, do not justify paying an evaluated 14% premium. Therefore, I have determined that KGL's overall proposal represents the best value to the Government.

ECF No. 58-1 at 273.

In its motion for judgment on the AR, plaintiff makes a general attack on DLA's best value determination.  See ECF No. 153 at 38-41.  Plaintiff argues that the overall technical evaluation was flawed based on a comparison of the ratings assigned to each factor of the parties' technical proposals.  Id. at 38.  Plaintiff also disagrees with DLA's trade-off analysis and claims it "was premised on the mistaken notion" that the technical evaluations both merited "Good" overall technical ratings.  Id. at 39.  Defendant maintains that its best-value analysis was rational, arguing that "DLA properly weighed the strengths and weaknesses of the offerors in conducting the price/technical best value tradeoff determination."  See ECF No. 155 at 35.

"Procurement officials have substantial discretion to determine which proposal represents the best value to the government."  E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996).  See also Bahrain Maritime & Mercantile Int'l BSC (C) v. United States, 118 Fed. Cl. 462, 480 (2014) (noting that an agency's discretion "is

particularly broad when a contract award decision is based on a best-value determination"). In the context of a challenge to a best value determination, the court "will examine the agency's evaluation to ensure that it was reasonable and consistent with the evaluation criteria and applicable statutes and regulations, since the relative merit of competing proposals is primarily a matter of administrative discretion." Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1330 (Fed. Cir. 2004) (citations omitted).

DLA's best value determination was based, in significant part, on the technical merits of each proposal. Indeed, in making its final award decision, DLA acknowledges that "technical merit is significantly more important than price." ECF No. 58-1 at 273. Given the flaws in DLA's evaluation of KGL's proposed warehouse, however, the court cannot find that the best value determination was "reasonable and consistent with the evaluation criteria." Galen, 369 F.3d at 1330.

D.      KGL's Responsibility Determination

Finally, plaintiff challenges DLA's determination that KGL was a responsible contractor. DLA issued its responsibility determination following corrective action on December 19, 2018. See ECF No. 181 at 1-3. Pursuant to Federal Acquisition Regulation (FAR) 9.103(a), contracts may be awarded to "responsible prospective contractors only." 48 C.F.R. § 9.103(a) (2018). The requirements for finding that a prospective contractor is responsible are listed in FAR 9.104-1. See 48 C.F.R. § 9.104-1 (2018). Plaintiff argues that DLA's responsibility determination failed to adequately establish that KGL meets three of those requirements. Specifically, plaintiff argues that KGL does not have: (1) "a satisfactory performance record," (2) "a satisfactory record of integrity and business ethics," and (3) "the necessary . . . facilities, or the ability to obtain them." See 48 C.F.R. § 9.104-1(c),(d), and (f).

KGL argues, as a threshold matter, that plaintiff has waived its ability to challenge DLA's responsibility determination because, "[d]espite its attempt to cloak its responsibility challenge in post-corrective action language, the record demonstrates that ANHAM, through its counsel, was fully aware before award of the factual assertions underlying ANHAM's responsibility challenge and DLA's treatment of them, but failed to protest prior to award." ECF No. 156 at 35. The court agrees, and will address the waiver of each issue in turn.[8]

---

[8]      In reaching this conclusion, the court does not express any opinion—or make any ruling—on the adequacy of DLA's responsibility determination.

1.    Satisfactory Performance

First, plaintiff claims that DLA failed to establish KGL's satisfactory performance record because it did not adequately investigate the termination of a contract between KGL Transportation Company and U.S. Transportation Command (TRANSCOM).  See ECF No. 153 at 45.  The record includes a Contractor Performance Assessment Report (CPAR) that explains that the contract

> was terminated for the convenience of the Government due to the Kuwait Port Authority (KPA) preventing the contractor from being able to perform. KPA threatened to prevent U.S. operations from being performed at the port and prevented contractor personnel from entering the port facilities.  As a result of ongoing missions needing [to] be performed, the contract was terminated for convenience two days into the performance period.

ECF No. 58-2 at 35.  Despite the termination, the assessing official gave KGL Transportation a positive review.  She rated the company's performance as "satisfactory," id. at 34, and stated that "[g]iven what I know today about the contractor's ability to perform in accordance with this contractor order's most significant requirements, I would recommend him for similar requirements in the future," id. at 35.

According to plaintiff, defendant had a duty to investigate this report further, but failed to do so.  Plaintiff argues that "there is no evidence that DLA made any attempt to contact TRANSCOM . . . to understand the details of that contracting failure," and accuses DLA of putting "blinders on and ignor[ing] the contract termination."  ECF No. 153 at 46.   The record demonstrates, however, that DLA included the same CPAR in its initial responsibility determination, see ECF No. 48-2 at 342-43, and that plaintiff had access to that prior responsibility determination during its GAO protest, see ECF No. 53-2 at 150-51 (copy of the Contracting Officer's Determination of Responsibility for KGL, included in the GAO protest materials); id. at 356 (copy of the CPAR following the TRANSCOM contract termination included with the GAO protest materials).

Despite its knowledge of the CPAR and DLA's consideration of it in the context of the first responsibility determination, plaintiff did not assert its objection thereto upon notice of the scope of the corrective action.  In its reply brief, plaintiff did not include any explanation for its failure to raise this issue.  See generally ECF No. 160.  Plaintiff impermissibly "s[a]t on its rights" by failing to object to DLA's prior treatment of the TRANSCOM contract termination before the second contract award, and has now waived its right to do so.  Blue & Gold, 492 F.3d at 1314 (citation omitted); see also CBE Grp., 138 Fed. Cl. at 236-37 (holding that plaintiff waived its right to raise an argument in a post-award protest when it was aware of the issue prior to corrective action) (citing Blue & Gold, 492 F.3d at 1313-15).

2.      Satisfactory Record of Integrity and Business Ethics

Plaintiff next argues that DLA did not establish KGL's satisfactory record of integrity and business ethics for purposes of satisfying FAR 9.104-1 because it "ignored and failed to investigate ominous statements made to DLA by a State Department official." ECF No. 153 at 46. The "ominous statements" to which plaintiff refers were made by a State Department official and summarized in an email which was included in DLA's initial responsibility determination. See id. See also ECF No. 48-2 at 384-85 (copy of the email included with the initial responsibility determination); ECF No. 53-2 at 150-51 (copy of the Contracting Officer's Determination of Responsibility for KGL included in the GAO protest materials); id. at 398-99 (copy of the email included in the GAO protest materials). Plaintiff argues that defendant failed to adequately investigate the statements it views as troubling. See ECF No. 153 at 46-47.

As with the TRANSCOM contract termination, however, plaintiff was aware of the State Department official's comments prior to the second award decision and did not object to the depth of DLA's investigation thereof. Plaintiff does not explain its failure to do so. See generally ECF No. 160. Here again, plaintiff impermissibly "s[a]t on its rights" by failing to object to DLA's prior treatment of the TRANSCOM contract termination before the second contract award, and has now waived its right to do so. Blue & Gold, 492 F.3d at 1314 (citation omitted); see also CBE Grp., 138 Fed. Cl. 236-37 (holding that plaintiff waived its right to raise an argument in a post-award protest when it was aware of the issue prior to corrective action) (citing Blue & Gold, 492 F.3d at 1313-15).

3.      Necessary Facilities

Plaintiff also claims that DLA's responsibility determination is flawed because it "failed to investigate and obtain sufficient information about KGLFS's ability to access the proposed KGLL warehouses." ECF No. 153 at 42. The facts underlying this argument are nearly identical to those presented by plaintiff in the context of its claim, considered previously in this opinion, see supra Section III.B.2, that DLA "failed to reasonably consider the risk associated with KGLFS's proposed use of KGLL's warehouses in light of the KPA eviction order and blacklisting decree," ECF No. 153 at 35. And the same analysis applies here.

It appears that DLA did not consider KGL's access to its proposed warehouses, in light of any legal proceedings, as part of the initial responsibility determination. DLA was, it seems, unaware of the legal issues until after its initial award decision. See ECF No. 54-1 at 993 (plaintiff quoting DLA statement admitting that "DLA Troop Support was generally unaware of either this [eviction] civil litigation or the KPA 'blacklisting' prior to the protests received in response to this award decision"). As previously noted, plaintiff had access to the initial responsibility determination, and therefore knew that

DLA had not addressed the legal issues therein.  Plaintiff was also aware that the GAO had both directly addressed the issue and concluded that there was "no basis to sustain this protest ground."  ECF No. 54-1 at 1468.  Despite its knowledge of the content of the initial responsibility determination, the GAO decision, and the scope of the corrective action, plaintiff did not raise the issue prior to the second contract award.  That KGL's legal issues were potentially relevant to at least two significant parts of the evaluation process highlights plaintiff's error in failing to address the matter at the time DLA announced its corrective action.  Plaintiff has waived its right to correct that error now.  See Blue & Gold, 492 F.3d at 1314-15; CBE Grp., 138 Fed. Cl. at 236-37.

        E.      Injunctive Relief

        Plaintiff asks the court to "enjoin Defendant from proceeding with the [contract] award" to KGL.  See ECF No. 153 at 47.  As the Federal Circuit has held:
>        In deciding whether a permanent injunction should issue, a court considers: (1) whether, as it must, the plaintiff has succeeded on the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief.

PGBA, LLC v. United States, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004) (citing Amoco Prod. Co. v. Vill. of Gambell, Alaska, 480 U.S. 531, 546 n.12 (1987)).  No single factor is determinative, as "the weakness of the showing regarding one factor may be overborne by the strength of the others."  FMC Corp. v. United States, 3 F.3d 424, 427 (Fed. Cir. 1993).  The court finds that these factors weigh in favor of a permanent injunction.

        1.      Success on the Merits

        As discussed above, plaintiff has succeeded on the merits of its protest in one regard—DLA abused its discretion in giving KGL ownership credit for its warehouse, and the court found that this error on DLA's part prejudiced plaintiff.  See supra Sections III.B.1, III.B.3.  That error, in turn, invalidates DLA's best value determination.  See supra Section III.C.  The first factor, therefore, weighs decidedly in plaintiff's favor.

        2.      Irreparable Harm

        The court also agrees with plaintiff that it will "suffer irreparable harm if DLA is allowed to proceed with the flawed" contract award to KGL.  ECF No. 153 at 48.  As evidence of irreparable harm, plaintiff offers the declaration of Jay Ward, plaintiff's Chief Executive Officer.  See ECF No. 153-1.  Therein, Mr. Ward testifies that plaintiff is the incumbent contractor, and that work under this contract constitutes approximately 39% of plaintiff's revenue.  Id. at 1-2.  He also states that "[t]he inability to compete for,

or the loss of the . . . contract, will result in severe financial harm to ANHAM, placing a significant number of its 624 employed personnel at risk." Id. at 2.

Defendant argues that plaintiff has failed to demonstrate that it will suffer irreparable harm.  According to defendant, plaintiff must show that it will lose profits absent an injunction, but here, plaintiff has only shown that it will lose nearly 40% of its revenue.  See ECF No. 155 at 50.  Defendant quotes NetStar-1 Government Consulting v. United States, 101 Fed. Cl. 511, 530 (2011), aff'd, 473 F. App'x 902 (Fed. Cir. 2012), in support of this proposition.  Contrary to defendant's suggestion, however, the NetStar decision does not address the distinction between profits and revenue in its discussion of irreparable injury.  Rather, the court describes the plaintiff's argument, as follows: "Plaintiff argues that it will suffer irreparable harm if an injunction is not granted, because the only other available relief—the potential for recovery of bid preparation costs—would not compensate it for the loss of valuable business." NetStar, 101 Fed. Cl. at 530 (emphasis added).  See also ARKRAY USA, Inc. v. United States, 118 Fed. Cl. 129, 138 (2014) ("[N]otwithstanding the fact that [plaintiff's] profit margins are not evident from the record, the court concludes that the denial of a fair opportunity to compete for potential profits and substantial revenue constitutes irreparable harm."); Furniture by Thurston v. United States, 103 Fed. Cl. 505, 520 (2012) ("The court has repeatedly held that 'the loss of potential profits' from a government contract constitutes irreparable harm.") (citation and internal quotation marks omitted).

KGL posits that plaintiff bears an even heavier burden than demonstrating lost profits.  According to KGL, plaintiff must show that it will be "put of business" absent an injunction in order to justify such relief, citing Telos Corp. v. United States, 129 Fed. Cl. 573, 578-79 (2016).  See ECF No. 156 at 48.  In Telos, the court stated that "[a] bid protester who has lost its protest on the merits must show more than [lost profits, loss of proprietary information, and adverse consequences for its employees and subcontractors] to satisfy the irreparable harm factor, such as the prospect that it will be put out of business." Telos, 129 Fed. Cl. at 578-79 (citation and internal quotation marks omitted). The rule applied in Telos is plainly inapplicable here because, as explained above, plaintiff has already succeeded on the merits of one of its claims in this case.

"When assessing irreparable injury, '[t]he relevant inquiry in weighing this factor is whether plaintiff has an adequate remedy in the absence of an injunction.'" NetStar, 101 Fed. Cl. at 530 (quoting Magellan Corp. v. United States, 27 Fed. Cl. 446, 447 (1993)).  The court concludes that absent a permanent injunction, plaintiff will not have an adequate remedy to guard against, or compensate it for, the loss of 40% of its business and the threat to the livelihood of potentially hundreds of people.  The fact that plaintiff is at risk of irreparable harm, indicates that this factor also weighs in plaintiff's favor.

### 3.    Balance of Hardships

Defendant argues that the balance of hardships favors the denial of a permanent injunction.  In support of this position, defendant points to the many hours spent by DLA working on the transition to KGL, and the delay in completing the transition that would be caused by an injunction.  See ECF No. 155 at 51.  DLA also estimates that a bridge contract with plaintiff would cost approximately $1.5 million more per month than KGL's performance of the contract.  Id.  The court notes that the investment defendant chose to make in transition activities was an investment it made consciously, with full knowledge of the issues raised by plaintiff.  See ECF No. 104 (notice from defendant informing the court that it intended to "begin the remaining transition activities" during the pendency of this case).  In fact, at a July 23, 2019 status conference, defendant's counsel acknowledged the risk it was taking.  Counsel stated:

> Whatever the court rules, we will assure there will be meaningful relief if the court rules in favor of ANHAM in this case.  Obviously there will have to be a ramp down period once KGL is ramped up if that's ultimately the determination of the court that for some reason, and we would disagree with that, that KGL couldn't perform.

ECF No. 174 at 14:58-15:18 (digital audio recording of July 23, 2019 status conference).  The irreparable harm plaintiff would suffer absent an injunction weighs heavily against defendant's hardships that are, to some degree, of its own making.

### 4.    Public Interest

"There is an overriding public interest in preserving the integrity of the procurement process by requiring the government to follow its procurement regulations."  Turner Constr. Co. v. United States, 94 Fed. Cl. 561, 586 (2010) (citation and internal quotation marks omitted), aff'd, 645 F.3d 1377 (Fed. Cir. 2011).  Here, the court has concluded that DLA failed to abide by the terms of its own solicitation in giving KGL ownership credit for its proposed warehouse.  See supra Section III.B.1.  Defendant argues that the public interest in national defense should outweigh plaintiff's concern for the integrity of the procurement process.  See ECF No. 155 at 52.  Defendant offers the testimony of a senior contracting officer on this point:  "Any delay in continuing these transition efforts could result in interrupted service to the military service members serving in the Iraq, Jordan, Kuwait, and Syria regions.  Any such interruption could jeopardize the health, well-being, and mission of US Forces in the region."  Id. at 62 (declaration of Jamie Shuster).[9]

---

[9]    Jamie Shuster did not serve as the contracting officer for the contract at issue in this litigation, but is "aware" of circumstances surrounding the initial award to KGL, the corrective action, and the second award to KGL.  See ECF No. 155 at 55.

The court agrees that the resolution of this matter must protect supply lines to our military service members and other personnel in the affected region.  Defendant, however, does not argue that those supplies can only be provided by KGL.  In fact, defendant implicitly acknowledges the viability of a bridge contract with plaintiff when it states that DLA estimates such a solution would "cost approximately $1.5 million more per month than KGL's new contract under the Solicitation."  Id. at 51.  Although the estimated additional cost of a bridge contract is significant, public confidence in the integrity of the government's procurement process is also worth a great deal.  Because a solution such as a bridge contract would protect national defense interests by ensuring supplies to the troops, this factor weighs in plaintiff's favor as well.

Because all four injunctive relief factors weigh in plaintiff's favor, the court will enter a permanent injunction in this case.

IV.    Motion to Strike

On July 1, 2019, defendant filed a motion to strike from the record two documents that plaintiff attached to its reply in support of its motion for judgment on the AR.  See ECF No. 163.  The first document is a June 16, 2019 decision from a Kuwaiti court, and the second document is a June 24, 2019 letter from plaintiff's chief executive officer to DLA, including several attachments.  See ECF No. 160-1.  Because the court did not rely on either of these documents in reaching its decision, the motion to strike is denied as moot.

V.    Motion to Complete the Administrative Record

On July 1, 2019, defendant filed a motion to complete the AR.  See ECF No. 164.  Therein, defendant sought to include in the record a memorandum relevant to DLA's investigation of the concerns raised by a State Department official with regard to KGL's status as a responsible contractor.  See id.  Because the court ruled that plaintiff waived its right to challenge DLA's responsibility determination on this point, see supra Section III.D.2, the motion to complete the AR is denied as moot.

VI.    Conclusion

Accordingly,

(1)    Plaintiff's motion for entry of a temporary restraining order, ECF No. 148, is **DENIED** as moot;

(2)    Plaintiff's motion for entry of a preliminary injunction, ECF No. 149, is **DENIED** as moot;

34

(3)     Plaintiff's motion for judgment on the AR, ECF No. 153, is **GRANTED in part**, as to DLA's decision to credit KGL with warehouse ownership, and the effect on DLA's best value determination, and is **DENIED in part**, as to the balance of the issues presented;

(4)     Defendant's cross-motion for judgment on the AR, ECF No. 155, is **DENIED in part**, as to DLA's decision to credit KGL with warehouse ownership, and the effect on DLA's best value determination, and is **GRANTED in part**, as to the balance of the issues presented;

(5)     Intervenor-defendant's cross-motion for judgment on the AR, ECF No. 156, is **DENIED in part**, as to DLA's decision to credit KGL with warehouse ownership, and the effect on DLA's best value determination, and is **GRANTED in part**, as to the balance of the issues presented;

(6)     The United States, by and through the Defense Logistics Agency, its officers, agents, and employees, is hereby **PERMANENTLY RESTRAINED AND ENJOINED** from continuing with transition activities and from obtaining performance from KGL Food Services, WLL, under Contract Number SPE300-18-D-4032, except to the extent that such activities are required under a bridge contract or other solution designed to ensure the continuous availability of the supplies or services provided for under the contract;

(7)     Defendant's motion to strike, ECF No. 163, is **DENIED** as moot;

(8)     Defendant's motion to complete the AR, ECF No. 164, is **DENIED** as moot;

(9)     The clerk's office is directed to **ENTER** final judgment in plaintiff's favor; and

(10)    On or before **September 18, 2019**, counsel for the parties shall **CONFER** and **FILE** a **notice** of filing, attaching a proposed redacted version of this opinion, with any material deemed proprietary blacked out, so that a copy of the opinion can then be made available in the public record of this matter.

IT IS SO ORDERED.

                                    s/Patricia E. Campbell-Smith
                                    PATRICIA E. CAMPBELL-SMITH,
                                    Judge